UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| DISH NETWORK L.L.C., <br> SLING TV L.L.C., and <br> NAGRASTAR LLC, <br><br> Plaintiffs, <br><br> v. <br><br> ALEJANDRO GALINDO, ANNA GALINDO, MARTHA GALINDO, and OSVALDO GALINDO, individually and collectively d/b/a NITRO TV, <br><br> Defendants. | § § § § § § § § § § § § § § § § | Case No. 3:21-cv-00218 |

## DECLARATION OF BERT EICHHORN

I, Bert Eichhorn, of Englewood, Colorado, declare as follows:

1. I make this declaration based on my personal knowledge and, if called upon to testify, would testify competently as stated herein.

2. I am a licensed private investigator with more than eighteen years of experience performing investigations in the telecommunications industry for businesses including DISH Network, Echostar, DirecTV, and Comcast. I have worked for Plaintiff NagraStar LLC ("NagraStar") since 2011, where I am employed as the Director of Field Security and Investigations. NagraStar provides security technology used to protect co-Plaintiff DISH Network L.L.C. ("DISH")'s satellite transmissions of television programming from piracy, i.e., unauthorized reception, retransmission, or viewing. I am

1

responsible for conducting investigations relating to the piracy of DISH programming as well as the programming of DISH's affiliate, co-Plaintiff Sling TV L.L.C. ("Sling").

### *The Judgment*

3. The Court entered a judgment in the amount of $100.3 million against Defendants Alejandro Galindo, his wife Anna Galindo, his mother Martha Galindo, and his brother Osvaldo Galindo ("Judgment Debtors") on June 9, 2022. (Doc. 19.) The Court's judgment was based on Judgment Debtors' operation of the Nitro TV service, whereby Judgment Debtors circumvented security measures to steal Plaintiffs' television programming and then retransmitted that stolen programming to their own paying subscribers. NagraStar's investigation of the Nitro TV service established hundreds of instances where the Judgment Debtors' service was configured to retransmit Plaintiffs' programming without authorization. (Doc. 1, ¶ 16.)

4. Judgment Debtors marketed the Nitro TV service with the intent of taking subscribers away from legitimate television providers such as Plaintiffs by encouraging customers to "Cut the Cord" and advertising the availability of premium programming for a monthly fee that is substantially less than the amounts the customers would have paid Plaintiffs – something Judgment Debtors could do because they stole the programming from Plaintiffs rather than paying to license such content. Examples of Judgment Debtors' marketing of Nitro TV are shown in screenshots included in Plaintiffs' complaint. (Doc. 1.)

5. Judgment Debtors monetized Nitro TV by selling codes that allowed users of the Nitro TV service to access stolen DISH and Sling Programming through various

internet-enabled devices ("Device Codes"). Prior to moving for final judgment, Plaintiffs obtained information from Judgment Debtors' merchant service providers and financial institutions establishing that Judgment Debtors sold at least 100,363 Device Codes and generated revenues in excess of $10 million. (Doc. 18 at 10.) The number of Device Codes attributed to Judgment Debtors was extremely conservative given the fact that Plaintiffs' calculations were based solely upon records obtained from five of eight known payment processing services and not all transactions in those account records were included in the overall total. (*Id.* at 10-11.)

6. Plaintiffs sent pre-suit cease and desist correspondence to Judgment Debtors requesting that they stop infringing Plaintiffs' rights. However, Plaintiffs' request was ignored and Judgment Debtors continued retransmitting programming stolen from Plaintiffs even after this case was filed.

### *Enforcement Efforts*

7. To date, Judgment Debtors have not made a single payment towards satisfying the Judgment nor have they designated any non-exempt property to be levied upon despite being served by the United States Marshal with a demand letter and copy of the writ of execution. The accounts that Judgment Debtors used to process payments received from their sale of Device Codes have been drained. For example, my review of Judgment Debtors' account records showed the following:

    a. Attached as Exhibit 1 is a copy of the relevant portions of documents Plaintiffs received in response to a subpoena to JPMorgan Chase Bank N.A. that contain statements from Judgment Debtor Martha Galindo's account ending in 2685 and Judgment

3

Debtor Osvaldo Galindo's account ending in 3107. Exhibit 1 was limited to only include the monthly checking summaries. Exhibit 1 shows that approximately $5,501,339.38 was deposited into Martha's account and approximately $316,920.12 was deposited into Osvaldo's account. However, JPMorgan Chase Bank's response to Plaintiffs' writ of garnishment stated that they were unable to locate any active accounts in Martha's name and Osvaldo's account had a minimal balance of $49.22. (Doc. 37.)

b.  Attached as Exhibit 2 is a copy of the relevant portions of documents Plaintiffs received in response to a subpoena to Capital One, N.A. that contain statements from Judgment Debtor Martha Galindo's account ending in 1505. Exhibit 2 was limited to only include the monthly account summaries. Exhibit 2 shows that approximately $3,041,242.24 was deposited into Martha's account. However, Capital One's response to Plaintiffs' writ of garnishment similarly stated that they were unable to locate any active accounts. (Doc. 44.)

c.  Attached as Exhibit 3 is a copy of the relevant portions of documents Plaintiffs received in response to a subpoena to Woodforest National Bank that contain statements from Judgment Debtor Anna Galindo's account ending in 4371. Exhibit 3 was limited to only include the monthly account summaries. Exhibit 3 shows that approximately $1,130,150.00 was deposited into Anna's account. However, Woodforest National Bank's response to Plaintiffs' writ of garnishment stated that Anna's account now has a negative balance. (Doc. 38.)

d.  Attached as Exhibit 4 is a copy of the relevant portions of documents Plaintiffs received in response to a subpoena to Wells Fargo Bank, N.A. that contain

statements from Judgment Debtor Alejandro Galindo's account ending in 0721. Exhibit 4 was limited to only include the monthly activity summaries. Exhibit 4 shows that approximately $164,135.05 was deposited into Alejandro's account. However, Wells Fargo's response to Plaintiffs' writ of garnishment stated that they too were unable to locate any active accounts.

8. All told, the entirety of the $10 million that Judgment Debtors are known to have received from their sale of Device Codes was removed from Judgment Debtor's accounts. Attached as Exhibit 5 is a copy of relevant portions of documents Plaintiffs received in response to subpoenas to JPMorgan Chase Bank N.A. and Bank of America N.A. that contain statements from Judgment Debtor Martha Galindo's accounts. Exhibit 5 shows that approximately $1,558,744.07 was wired from Martha's accounts to Alejandro Galindo Belmares in Mexico. Alejandro Galindo Belmares is believed to be Martha Galindo's husband and Judgment Debtors Alejandro and Osvaldo Galindo's father. Attached as Exhibit 6 is a copy of the relevant portions of documents produced by Early Warning Services, LLC (owner of Zelle Network) in response to Plaintiffs' subpoena. Exhibit 6 shows Judgment Debtor Alejandro Galindo's ex-wife, Aneth Zertuche, receiving approximately $181,730.00 from Alejandro and Martha Galindo and several known resellers of the Nitro TV service. Such transfers further demonstrate that Judgment Debtors have taken steps to conceal their illicit funds and prevent Plaintiffs from enforcing the Judgment.

### *The Friendswood Property*

9.  Judgment Debtors used the proceeds from their infringing Nitro TV service to purchase the property located at 311 Scenic View, Friendswood, Texas 77546 ("Friendswood Property"). The Friendswood Property was purchased using funds that Judgment Debtors wrongfully acquired from their sale of Device Codes based on my review of the following:

   a.   Attached as Exhibit 7 is a copy of the relevant portions of documents Plaintiffs received in response to a subpoena to Paymentech that contain statements from Judgment Debtor Martha Galindo's account ending in 2083. This Paymentech account was used by Judgment Debtors for the sole purpose of receiving payments for Device Codes. Paymentech produced 368 pages and therefore Exhibit 7 was limited to only include monthly statements and deposit summaries. Exhibit 7 shows that approximately $5,546,524.37 was deposited into Judgment Debtor Martha Galindo's account ending in 2083 between March 2018 and November 2020. This time frame corresponds with the time period that Judgment Debtors retransmitted Plaintiffs' stolen content on the Nitro TV service. (Doc. 1 at 5.)

   b.   Attached as Exhibit 8 is a copy of the relevant portions of documents produced by JPMorgan Chase Bank N.A. in response to Plaintiffs' subpoena. Exhibit 8 shows that approximately $5,460,939.00 was deposited into Martha's Chase business account ending in 2685 directly from her Paymentech account. The documents produced show that 99.3% of the money deposited into this Chase business account during the two-year period leading up to the purchase of the Friendswood Property came from the

Paymentech account – with the other .7% coming from sporadic reseller payments and casino refunds.

   c. Attached as <u>Exhibit 9</u> is a copy of the relevant portions of documents produced by JPMorgan Chase Bank N.A. in response to Plaintiffs' subpoena. Exhibit 9 shows that $930,000.00 was withdrawn from Judgment Debtor Martha Galindo's Chase business account ending in 2685 on March 13, 2022 and then deposited into a new Chase account ending in 5086 that was opened in Martha's name that very same day.

   d. Attached as <u>Exhibit 10</u> is a copy of the relevant portion of an account statement from Judgment Debtor Martha Galindo's Chase account ending in 5086 showing that $925,913.18 was wired from this account to Chicago Title of Texas on March 16, 2020. Attached as <u>Exhibit 11</u> is a copy of the relevant portions of documents produced by Chicago Title of Texas, LLC in response to Plaintiffs' subpoena showing that the $925,913.18 wired from Martha's Chase account was used to purchase the Friendswood Property under Judgment Debtor Alejandro Galindo's name.

  10. Attached as <u>Exhibit 12</u> is a screenshot from the Galveston Central Appraisal District's website showing the Friendswood Property is held in the name of Judgment Debtor Alejandro Galindo and is not designated as a homestead for tax purposes.

  11. Based on my investigation of the Judgment Debtors, at no time during the operation of Nitro TV did Judgment Debtors have a legitimate stream of income sufficient to purchase the Friendswood Property with $925,913.18 in cash.

*Judgment Debtors' Homestead Properties*

12.     Prior to purchasing the Friendswood Property, Judgment Debtors owned the following residential properties located in Galveston County, Texas that they claimed as their homestead: (1) Alejandro and his wife Anna Galindo owned the property located at 1737 Cranston Grove Dr., Dickinson, Texas 77539; (2) Martha Galindo owned the property located at 4810 Alamo Dr., Galveston, Texas 77551; and (3) Osvaldo Galindo owned the property located at 3110 Colony Dr., Dickinson, Texas 77539. Attached as Exhibit 13 are screenshots from the Galveston Central Appraisal District's website showing Judgment Debtors ownership of such properties and homestead designation during the 2020 tax year. Judgment Debtors Martha and Osvaldo Galindo continue to own such properties and claim homestead protection over them as shown by screenshots from the Galveston Central Appraisal District's website for the 2022 tax year attached hereto as Exhibit 14.

13.     Judgment Debtors Alejandro and Anna sold their homestead in Dickinson, Texas nine months after the Friendswood Property was purchased. Attached as Exhibit 15 is a copy of the relevant portion of an account statement from Anna's account at Woodforest National Bank ending in 4371. Exhibit 15 shows that $289,738.59 of the proceeds from the sale were deposited into Anna's account on December 14, 2020.

I declare under penalty of perjury that the foregoing is true and correct. Executed on October 12, 2022.

_____
Bert Eichhorn